UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MIRANDA L. DAY,
for herself and all persons
similarly situated,

       Plaintiff,

v.                       CASE No. 8:10-CV-2463-T-TGW

PERSELS & ASSOCIATES,
LLC, et al.,

       Defendants.

_____

## O R D E R

The plaintiff, Miranda L. Day, alleges in this lawsuit violations of the Credit Repair Organizations Act, 15 U.S.C. 1679, et seq., and several common law claims. Defendant CareOne Services, Inc., moves to dismiss for lack of subject matter jurisdiction and to compel arbitration on the basis that the plaintiff's claims against it are subject to a mandatory arbitration provision. In addition, defendants Persels & Associates, LLC; Ruther & Associates, LLC; Jimmy B. Persels; Neil J. Ruther; and Robyn R. Freedman seek dismissal of the claims against them on the grounds that: (1) this court lacks personal jurisdiction over Ruther and Persels; (2) the law firms are not

"credit repair organizations" under the Credit Repair Organizations Act; and (3) the plaintiff has failed to state a claim for relief with respect to the claims for legal malpractice, negligence, breach of fiduciary duty, and negligent supervision.

For the following reasons, CareOne Services, Inc.'s motion to compel arbitration of the claims against it will be granted. Further, the motion to dismiss filed by Persels & Associates, LLC; Ruther & Associates, LLC; Jimmy B. Persels; Neil J. Ruther; and Robyn R. Freedman will be denied.

## I.

CareOne Services, Inc., a Maryland corporation, "advertises, promotes and sells 'debt management' and 'debt settlement' plans" (Doc. 98, ¶11).[1] In November 2007, the plaintiff, a resident of Florida, contacted CareOne "[i]n an effort to reduce her balances, lower her monthly payments, better manage her finances, and to improve her credit" (Doc. 1, ¶34). Thereafter, the plaintiff entered into a "debt management plan" with CareOne (id., ¶36; Doc. 200-1).

---

[1] CareOne was formerly known as Freedom Point (Doc. 98, ¶11).

In connection with her debt management plan, the plaintiff electronically received an "enrollment package," which included a Summary Page, Client Agreement, Repayment Schedule, and Easy Pay Authorization (Doc. 200-1). The Summary Page states, **"Please read each [document] and sign below in the space indicated and confirm the banking information below**. When you sign, you agree to the Client Agreement and Easy Pay Authorization" (id., p. 1) (emphasis in original).

The Easy Pay Authorization form gave CareOne permission to debit the plaintiff's checking account each month beginning on November 18, 2007 (id., p. 2[2]) . The form included an instruction for the plaintiff to sign and fax it to CareOne.

On November 12, 2007, the plaintiff electronically signed the Client Agreement (Doc. 25-1, ¶3; id., p. 12). As explained in that agreement, the debt management plan would allow the plaintiff to "repay [her] debts through a structured plan" and give her "access to educational resources, support and financial coaching" (Doc. 200-1, p. 3). Services provided under

---

[2]All references to the record correspond to the docket and page numbers assigned by CM/ECF.

the plan included budget analysis, development of a payment schedule with

each of the plaintiff's creditors, and communication directly with her

creditors regarding the terms of the repayment plan (id.).

The Client Agreement states, in pertinent part (id., pp. 4-5)

(emphasis in original):

> **Arbitration Agreement.** If you [CareOne] or I
> [the plaintiff] elect, any claim or dispute between
> you and me (or any parent, subsidiary, affiliate,
> successor or assignee, officer, director, employee,
> agent or representative of you or me) arising from
> or relating to this agreement, our relationship or
> your services ("Claim") must be resolved by
> binding arbitration in accordance with this
> arbitration agreement and the Commercial Dispute
> Resolution Procedures and Supplementary
> Procedures for Consumer-Related Disputes of the
> American Arbitration Association ("AAA"). (This
> includes all kinds of Claims, such as Claims
> relating to this arbitration agreement and the
> remainder of this agreement; Claims relating to
> your advertising or promotional materials; initial
> claims, counterclaims, cross-claims and third-party
> claims; and Claims based upon contract, tort, fraud,
> misrepresentation and other intentional torts,
> constitution, statute, ordinance, regulation,
> common law and equity.)....
>
> ...

> *No class actions, etc.* You and I also agree that the
> arbitrator only may resolve the claims, disputes, or
> controversies between you and me. The arbitration
> won't be conducted on a class-wide basis or be
> consolidated with claims or demands of other
> persons.   I agree not to participate in a
> representative capacity or as a member of any class
> of claimants, pertaining to any Claim.
>
> ...
>
> I may reject this arbitration agreement by sending
> a rejection notice that you receive at 8930 Stanford
> Boulevard, Columbia, Maryland 21045 (and no
> other location) within 60 days after the date of this
> agreement.  I must sign any rejection notice and I
> must include my name, address, telephone number
> and agreement number.  This is the only method I
> can use to reject this arbitration agreement.

The Client Agreement further provides, "The Arbitration Agreement ...

continue[s] to apply after this agreement ends" (id., p. 5).

According to Nicholas Christ, Senior Director of Sales at

CareOne, the plaintiff made one payment pursuant to her debt management

plan in December 2007, and the payment was refunded when the plaintiff

cancelled her plan (Doc. 25-1, ¶4).  Christ further avers that the plaintiff "did

not notify CareOne that she wished to opt out of the arbitration agreement in

the Client Agreement within 60 days after the date of the Client Agreement, or at any time thereafter" (id., ¶5).

On December 14, 2007, the plaintiff entered into a Retainer Agreement with the law firm of Ruther & Associates, LLC, which later changed its name to Persels & Associates, LLC (Doc. 98, ¶65; Doc. 98-3; Doc. 203, ¶3). Attorney Neil J. Ruther, a Maryland resident, is the Managing Member of Persels & Associates (Doc. 203, ¶¶2, 4). Attorney Jimmy B. Persels, also a resident of Maryland, is now retired and has no current ownership in the law firm (Doc. 204, ¶¶2-3).

Joseph M. Gusmano worked as an associate attorney for Persels & Associates from September 2008 to December 2009, under the supervision of Persels (Doc. 98-1, ¶¶4-5; Doc. 98-2, ¶¶2-3). His duties included training CareOne's sales representatives and Payment Assistance Team members to obtain clients for the debt management plans and debt resolution plans (Doc. 98-2, ¶6). Gusmano "did not represent Ms. Day, or supervise anyone working on the Miranda Day file or representing Ms. Day" (Doc. 98-1, ¶6).

Gusmano avers that, until approximately February 14, 2009, Persels was the only other attorney employed by Persels & Associates (id., ¶5). Only Persels could authorize a refund to a client (id., ¶8).

According to Gusmano, Persels "personally created and implemented" the policies followed by Robyn R. Freedman, the attorney who worked on the plaintiff's case (id.).[3] Gusmano further states that "at different times during the time period from November 2007 to October 2009, either or both Mr. Ruther and Mr. Persels supervised or were obligated to supervise" Freedman (id., ¶7).

Among other things, CareOne provided paralegal services for the law firms (Doc. 98, ¶¶40, 133). In particular, CareOne's paralegals obtained signed retainer agreements for debt resolution plans from clients, and they performed the debt settlement legal work for consumers (id., ¶¶42, 51). Gusmano avers that CareOne's paralegals obtained the retainer agreements prior to informing Persels & Associates about any communication with the consumer, and CareOne's employees never spoke to clients about communicating with an attorney (Doc. 98-2, ¶¶9-10).

---

[3]Freedman is licensed in Florida, but resides in New Jersey (Doc. 98, ¶19).

CareOne tracked statistics about the debt settlement plans (Doc. 98, ¶53). In this connection, Gusmano states that CareOne "regularly settled a consumer's unsecured debts in the range of 48 to 52 percent of original face value of a consumer's unsecured debt, based on a 60 month [debt management] payment plan" (Doc. 98-2, ¶11).

The "standard debt settlement plans" involved monthly payments of 50 to 60 percent of the face value of the client's debt (Doc. 98, ¶54). CareOne and the law firms deducted their fees "off the top" of the monthly payments, "leaving no more than 35 to 45 percent of the face value of the consumer's debt to fund a debt settlement plan based on 48 to 52 percent of the original face value of the settled debt" (id., ¶55).

Gusmano asserts, "For the vast majority of clients it was not possible for the remaining 35 to 45 percent of the face value of the consumer's debts to fund a settlement at 48 to 52 percent of the original face value," and CareOne concealed this from him until July 2009 (Doc. 98-2, ¶17). He disclosed the "concealment and misrepresentation of the [debt resolution plans] that were engineered to fail" to CareOne, Persels, and Ruther, but CareOne and Persels "continued the concealment and

-8-

misrepresentations after [his] disclosures" (id., ¶¶18-19). Gusmano avers that statements by Ruther and Persels that they would take or had taken action were false (id., ¶20).

As indicated, the plaintiff entered into a Retainer Agreement with Ruther & Associates for "Debt Resolution Services" (Doc. 98-3). Specifically, the plaintiff retained Ruther & Associates and its administrative staff at CareOne "to help [her] resolve [her] unsecured debt" (id., p. 1). The agreement stated that Ruther & Associates and CareOne would "work on [the plaintiff's] behalf to negotiate settlements with [her] creditors that are within [her] means" (id.).

The Retainer Agreement relevantly provides (id.) (emphasis in original):

> **3. Creditor Offers.**   Once balances have accumulated in your attorney escrow account, we will contact your creditors regularly to try to get them to accept a payment plan or settlement offer. If a creditor doesn't accept our offer initially, we will continue to contact them to discuss settlement options.   We will negotiate with your creditor to obtain the best settlement option available.   We may settle with a creditor for any amount up to the Pre-Plan Debt.

> **You understand that until a creditor accepts our offer, the creditor may keep trying to collect the debt. The creditor's collection efforts <u>may include filing a lawsuit against you</u>. In the event you are sued, we will assist you in preparing an answer to such suit and will negotiate with the creditor's attorney on your behalf. We will <u>not</u> go to court with you or file an appearance on your behalf, as the cost of doing so would be prohibitive. We will advise you on what the creditor can do, if anything, with a judgment and will work with you to revise your debt reduction plan if it's necessary to serve your interests. More complex legal services like answering interrogatories, responding to demands for production of documents or preparing legal memoranda and the like will be billed separately but at vastly reduced rates. You will be notified of the charge for any such services before we perform them.**

It further states (<u>id.</u>, p. 3) (emphasis in original):

> 11. **Credit Reports.** You have already authorized us to get your credit report and we have done so. You authorize us to get credit reports on you from time to time. Our services DO NOT include helping you improve your credit report, record, history or rating, or helping you dispute information in your credit report. If you ask our lawyers or paralegals to assist you in doing so, small additional legal fees will be charged after you have consented to same.

12. **Credit Bureau Reporting.** We do not report any information to credit bureaus or anyone else. Your creditors may make unfavorable or negative reports. We have no control over what your creditors do in that regard.

...

14. **Payment to your Creditors.** If you do not make the required minimum payments to your creditors you may be breaking the terms of your agreement with them and your actions will probably be reported to consumer reporting agencies as a late, delinquent, charged-off or past due balance. This is true whether or not you have enrolled in our program. After settlement, your creditor may comment that the account was "settled for less than the full amount" on your credit report. Depending upon the condition of your credit report at the time of enrollment, our debt reduction program may have an adverse effect on your credit report and credit score. Furthermore, if you do not make your minimum payments, your creditor may raise the interest rate on your account. Your account balance will continue to grow as your creditor adds accrued interest, late fees, over-limit fees and penalties. Your balance will continue to grow until a settlement is reached with your creditor; and, if negotiations are unsuccessful, you could be called upon to pay the entire balance.

...

18. **No Guarantee.** The success of your debt resolution depends on your making consistent

-11-

> monthly payments and the willingness of your
> creditors to accept our offers. <u>We cannot guarantee
> results</u>. Some or all of your creditors may try to
> collect your debts and sue you, and we cannot stop
> them from exercising their legal rights.

Unlike the Client Agreement, the Retainer Agreement contains no arbitration

clause.

With regard to communicating with creditors, the Retainer

Agreement provides (<u>id</u>., p. 2):

> **9. Creditor Negotiation & Communication.** You
> agree that you won't negotiate directly with your
> creditors unless we authorize you to do so as in the
> case where you must go to court. We will answer
> all correspondence and telephone calls from your
> creditors. This is to protect your interests and to
> assist us in reducing harassment from creditors.

Similarly, the General Disclosures attached to the Retainer Agreement state,

"It is essential that you do not negotiate payments directly with your creditors

or take on any new debt during your program or your program could be in

jeopardy" (<u>id</u>., p. 5).

The Retainer Agreement was signed by Ruther and Persels (<u>id</u>.,

p. 4). CareOne was not a signatory to this agreement.

Pursuant to the Retainer Agreement, the plaintiff was required to pay a legal fee of 15% of her pre-plan debt, which was shared by CareOne and the law firms (id., p. 2; Doc. 98, ¶¶55-57). As part of that legal fee, the plaintiff would "receive basic legal services"; fees could "be higher based on the complexity of the situation and the timeline required to respond" (Doc. 98-3, p. 2).

Between January and June 2008, the plaintiff made monthly payments of $212.39, for a total of at least $1,274.34 (Doc. 98, ¶¶90-91). The plaintiff alleges, however, that none of the funds she paid were disbursed to her creditors, and all of the money paid went for the fees of the law firms and CareOne (id., ¶91). In addition, the plaintiff contends that the law firms and CareOne made no attempt to negotiate with her creditors (id., ¶92).

In April 2008, as a result of the nonpayment on her debt, the plaintiff was sued by one of her creditors, Chase Bank USA, N.A. (id., ¶93). Although the plaintiff tried to contact CareOne and the law firms for assistance after being served with the complaint, her requests were initially ignored (id., ¶¶94-96).

On April 21, 2008, the plaintiff received an email from Legal Advice Line, LLC, forwarding a letter from Freedman (Doc. 98-5). Legal Advice Line, a Maryland law firm owned by Ruther, acted as co-counsel with Ruther & Associates and Persels & Associates in representing the plaintiff (Doc. 98, ¶¶15, 59, 60). Legal Advice Line "uses the same infrastructure and the same attorneys" as Persels & Associates (id., ¶61).

In her letter to the plaintiff, Freedman explained, "I am the attorney assigned to your case," and "I have reviewed your file and will be working closely with the paralegal negotiators who will attempt to settle your debts with your creditors" (Doc. 98-5, p. 2). Freedman also said, "If you receive any phone calls or letters from these creditors, you should notify them that the law firm of Ruther & Associates represents you and all inquires should be directed to our office" (id.) (emphasis in original).

The plaintiff asserts that she did not receive any assistance from CareOne, the law firms, or the attorneys while the Chase lawsuit was pending (Doc. 98, ¶107). On July 10, 2008, a default judgment was entered against the plaintiff and in favor of Chase (id., ¶106).

In an email dated July 1, 2008, Legal Advice Line sent the plaintiff a "form answer" to the complaint in the Chase lawsuit (id., ¶108; Doc. 98-6). The plaintiff received the answer after default was already entered against her (see Doc. 98, ¶108).

The plaintiff was sued by another creditor, HSBC Bank Nevada, N.A., in early July 2008 (id., ¶111). Once again, the plaintiff tried to contact CareOne, the law firms, and Freedman (id., ¶112). The plaintiff alleges that, despite a CareOne representative's promise that CareOne "would 'take care of' the HSBC Lawsuit," she did not receive any assistance from CareOne, the law firms, or the attorneys (id.).

Subsequently, on July 15, 2008, the plaintiff filed a voluntary petition for bankruptcy pursuant to Chapter 13 of Title 11 of the United States Code (id., ¶126). The defendants continued to make withdrawals from the plaintiff's bank account through October 2009 (id.).

On November 4, 2010, the plaintiff brought this lawsuit against Persels & Associates, 3C Incorporated d/b/a CareOne Credit Counseling, Freedom Point, Ascend One Corporation, Ruther & Associates, Persels,

Ruther, Freedman, and Bernaldo Dancel (Doc. 1).[4]  She sued on behalf of herself and a class of approximately 10,000 Florida residents.  In addition to common law claims, the plaintiff alleged that the defendants committed violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, et seq., and the Credit Repair Organizations Act ("CROA"), 15 U.S.C. 1679.

In response to the complaint, Ascend One; 3C Incorporated; Freedom Point Corporation n/k/a CareOne Services, Inc.; and Dancel filed a Motion to Dismiss for Lack of Personal Jurisdiction and/or to Compel Arbitration and Stay Action or, in the Alternative, to Dismiss Class Action Complaint (Doc. 25).  In addition, Persels & Associates, Ruther & Associates, Persels, Ruther, and Freedman (collectively "law firm defendants") moved for dismissal (Doc. 39).  The district judge referred these motions to me for a report and recommendation (Doc. 52), and the parties subsequently filed a Consent to Exercise Jurisdiction by a United States Magistrate Judge for

---

[4]Ascend One is the corporate parent of CareOne and Freedom Point; Bernaldo Dancel is the founder of all three of these companies (Doc. 1, ¶¶13-16).

disposition of these motions (Doc. 58). The parties later consented to have me preside over all proceedings in this case (Doc. 90).

At a hearing on the motions to dismiss, which was held before me on April 6, 2011, the plaintiff requested leave to file an amended complaint (Docs. 66, 67). I therefore denied the motions to dismiss as moot, and noted that I would take the motion to compel arbitration and stay action under advisement (Doc. 67). I subsequently granted the motion to compel and ordered arbitration (Doc. 82). However, as to CareOne, my Order indicated that "absent some additional showing, the stay [due to arbitration would] only be with respect to discovery and proceedings involving the Client Agreement" (id., p. 21). Thereafter, CareOne moved to "alter or amend, and/or seek relief from, that portion of the Court's Order dated May 9, 2011, denying CareOne's motion to compel arbitration with respect to those of Plaintiff's claims against CareOne that are based on the Retainer Agreement" (Doc. 95, p. 1).

On June 10, 2011, the plaintiff filed, on behalf of herself and approximately 10,000 similarly situated Florida consumers, an amended complaint against CareOne, Persels & Associates, Ruther & Associates,

-17-

Ruther, Persels, Freedman, and Legal Advice Line (Doc. 98). Relying solely on the Retainer Agreement, the amended complaint alleges violations of the CROA, legal malpractice, breach of fiduciary duty, aiding and abetting the breach of fiduciary duty, negligent supervision, and negligence.

Thereafter, and prior to any ruling on CareOne's motion to alter or amend, the parties notified the court that they had reached an agreement in principle regarding settlement of this case (Doc. 103). I therefore entered an Order staying the case for sixty days (Doc. 104).

In September 2011, the plaintiff filed a Motion for Preliminary Approval of Class Action Settlement Agreement, seeking: (1) conditional certification of the Class; (2) the appointment of plaintiff's counsel as counsel for the Class; (3) preliminary approval of the terms of the proposed settlement agreement; (4) approval of the proposed Notice to the Class and the plan for dissemination of the Notice to the Class; and (5) the setting of a Fairness Hearing (Doc. 110). The settlement agreement expanded the Class to over 125,000 consumers. Upon review of the papers, I found that the proposed settlement appeared fair, adequate, and reasonable, and that the Notice Plan was an appropriate means of providing notice to the Class members (Doc.

-18-

112, pp. 1-2).  Thus, I issued an Order granting the plaintiff's motion for preliminary approval of the class action settlement (Doc. 112), and I denied CareOne's motion to alter or amend as moot (Doc. 113).

The parties then moved for final approval of the settlement (Docs. 144, 147, 150).  Following a fairness hearing, this court approved the proposed settlement as "fair, adequate, and reasonable despite the lack of a monetary payment to the Class members" based on "(1) the ability of the Class members to opt out of the settlement agreement; (2) the financial inability of the defendants to pay a meaningful award, much less to respond to a large judgment; and (3) my complete confidence in the ability and integrity of [Class] counsel" (Doc. 157, pp. 15-16).  On September 10, 2013, the Eleventh Circuit vacated the final judgment approving the settlement agreement and remanded the case for further proceedings on the ground that the record did not adequately support the defendants' inability to satisfy a judgment. Day v. Persels & Associates, LLC, 729 F.3d 1309 (11th Cir. 2013).

Upon remand, the plaintiff and the defendants again moved for final approval of the settlement (Doc. 176).  A final fairness hearing was held before me on January 22, 2014.

-19-

Based on evidence that one or more of the defendants could financially contribute to this matter, I entered an Order denying the parties' joint motion to approve the settlement (Doc. 187). That Order stated that "any motions which were previously denied as moot in light of the proposed settlement may be refiled" (id., p. 18).

CareOne now moves to dismiss for lack of subject matter jurisdiction and to compel arbitration on the basis that the plaintiff's claims against it are subject to a mandatory arbitration provision (Doc. 200). Alternatively, CareOne argues that the plaintiff's claims against it should be dismissed pursuant to Rule 12(b)(6), Fed.R.Civ.P. In addition, CareOne has filed a motion to alter or amend and/or seek relief from the judgment dated May 9, 2011 (Doc. 210).

The law firm defendants also move for dismissal, arguing that: (1) this court lacks personal jurisdiction over Ruther and Persels; (2) the law firms are not "credit repair organizations" under the CROA; and (3) the plaintiff has failed to state a cause of action upon which relief may be granted with respect to the claims for legal malpractice, negligence, breach of

fiduciary duty, and negligent supervision (Doc. 202).   This motion is supported by declarations from Ruther and Persels (Docs. 203, 204).

The plaintiff submitted memoranda in opposition to each of the motions (Docs. 207, 208, 212).  Subsequently, on November 19, 2014, oral argument was conducted before me.

## II.

Defendant CareOne Services filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration (Doc. 200) on the ground that the plaintiff's claims against CareOne are subject to a mandatory arbitration provision contained in the Client Agreement executed between the plaintiff and CareOne (id., pp. 1, 4).[5]  That provision states in pertinent part (Doc. 200-1, p. 4).

> **Arbitration Agreement.**  If you or I elect, any claim or dispute between you and me ... arising from or relating to this agreement, our relationship or your services ("Claim") must be resolved by binding arbitration ... (This includes all kinds of Claims, such as Claims relating to this arbitration

---

[5]The plaintiff subsequently cancelled the Client Agreement (Doc. 25-1, p. 2, ¶4). However, the Client Agreement provided that "[t]he Arbitration Agreement and the No Liability paragraphs of this agreement continue to apply after this agreement ends" (id., p. 8).

agreement and the remainder of this agreement;
Claims relating to your advertising or promotional
materials; initial claims, counterclaims, cross-
claims and third-party claims; and Claims based
upon contract, tort, fraud, misrepresentation and
other intentional torts, constitution, statute,
ordinance, regulation, common law and equity.)

The plaintiff disputes that the arbitration provision applies here
because the claims in the amended complaint are based upon CareOne's role
under the Retainer Agreement, which does not contain an arbitration clause
(Doc. 207, p. 3). CareOne, however, argues that the plain language of the
arbitration provision is very broad and "encompasses all of Plaintiff's claims
against CareOne, including those that arise under Plaintiff's Retainer
Agreement" (Doc. 200, p. 1). Defendant CareOne is correct.

"The FAA reflects the fundamental principle that arbitration is
a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 64, 67
(2010) (citation and quotation omitted). Therefore, the scope of an arbitration
agreement depends on the intent of the parties. Seaboard Coast Line Railroad
Co. v. Trailer Train Co., 690 F.2d 1343, 1352 (11th Cir.1982). Accordingly,
"a party cannot be required to submit to arbitration any dispute which he has
not agreed so to submit." AT&T Technologies, Inc. v. Communication

-22-

Workers of America, 475 U.S. 643, 648 (1986). On the other hand, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." District No. 1-Marine Engineers Beneficial Assn. AFL-CIO v. GFC Crane Consultants, 331 F.3d 1287, 1290 (11th Cir. 2003), quoting Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 78 (1998). Consequently, "[t]o determine what disputes the parties agreed to arbitrate, [the court] begin[s] with the language of the applicable arbitration provision, keeping in mind 'that any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." World Rentals and Sales, LLC v. Volvo Const. Equipment Rents, Inc., 517 F.3d 1240, 1245 (11th Cir.2008).

    The language of the arbitration provision in this case is unambiguously broad. As indicated, it provides for the arbitration of any "claim or dispute between [the plaintiff and CareOne] ... arising from or relating to this agreement, our relationship or [CareOne's] services..." (Doc. 200-1, p. 4). Thus, by its plain terms, the arbitration provision applies not only to claims and disputes arising from or related to the Client Agreement,

-23-

but also to any claim arising from, or related to, the relationship between the plaintiff and CareOne and CareOne's services for the plaintiff (see id.). Buttressing this conclusion is the language that the arbitration clause is applicable to "all kinds of Claims," including those "related to th[e] arbitration agreement and remainder of this [client] agreement; Claims relating to your advertising or promotional materials; initial claims, counterclaims, cross-claims and third-party claims; and Claims based upon contract, tort, fraud, misrepresentation and other intentional torts, constitution, statute, ordinance, regulation, common law and equity" (see id.).

Furthermore, the claims in the plaintiff's amended complaint directly arise from, and are related to, CareOne's services for the plaintiff and CareOne's relationship with the plaintiff (Doc. 200, p. 9). Thus, the plaintiff alleges in the amended complaint that the defendants offered services to "assist those in financial trouble" (Doc. 98, ¶1), specifying that (id., ¶35; see also Doc. 25-2, ¶13):

> "[t]he basic services of CareOne and the Law Firms involve ... improving credit behavior prospectively, improving a credit record, credit history and credit rating with a more favorable rating, history or rating in the future by promising to reduce debts to

> a lower level where remaining debts can be paid as agreed and the debtor can achieve 'financial health'.... Further, Care One and the Law Firms provided advice and assistance to consumers with regard to activities and services related to improving consumer 'financial health'...."

The crux of the plaintiff's amended complaint is that CareOne failed to provide those financial services as agreed, thereby worsening her financial situation. Thus, among other things, the plaintiff alleges that the defendants did "little or nothing to reduce [her] debt or assist [her] with creditors and [her] collectors" (Doc. 98, ¶1; see also id., ¶¶88, 91, 92). Accordingly, the claims in the amended complaint arise from, and relate to, CareOne's financial services and its client relationship with the plaintiff.

Moreover, the Retainer Agreement directly arises from, and is related to, the plaintiff's relationship with CareOne. Thus, it is alleged that "Care One is an agent of the Law Firms" and that CareOne obtained the signed retainer agreements for the law firms (id., ¶¶40, 51; Doc. 98-2, ¶10). Further, the plaintiff asserts that "[a]ll Defendants acted jointly and severally, are affiliated with one another, provided substantial assistance to one another, [and] participated with each other in the common scheme ..." to "entice

-25-

financially-troubled consumers to enter into so-called 'debt management programs'" (Doc. 98, ¶¶20, 33).   In sum, the arbitration provision is applicable to the claims made by the plaintiff in this action, as they relate to the plaintiff's relationship with CareOne and financial services that she alleges that CareOne failed to provide to her.

The plaintiff argues that arbitration may not be compelled because the arbitration clause applies only to "claims relating to the Client Agreement, the parties' relationship under that agreement, or the services CareOne was obligated to provide under the agreement" (Doc. 207, p. 4) (emphasis added). This argument is unpersuasive because the plain language of the arbitration clause does not limit itself to disputes under the Client Agreement. Furthermore, the plaintiff's construction of the arbitration clause impermissibly adds language to the arbitration provision, and renders part of it superfluous.

As indicated, the arbitration clause provides that disputes "arising from or relating to this agreement, our relationship or your services ... must be resolved by binding arbitration ..." (Doc. 200-1, p. 4) (emphasis added).   The use of the disjunctive "or" following "this agreement" shows

-26-

that the arbitration provision extends beyond disputes arising from the Client Agreement. See Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir.1982), overruled on other grounds, Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217 & n. 3 (1985).

In Belke, the Eleventh Circuit determined the scope of a provision requiring arbitration of "any controversy between us arising out of your business or this agreement." 693 F.2d at 1026 n.4. The court explained that the disjunctive "or" has an expansive meaning. Thus, the Eleventh Circuit stated (id. at 1028) (emphasis in original):

> By its own terms the contract between the parties covers not only disputes arising out of the agreement, but in the disjunctive includes "any controversy between us arising out of your business." ... An arbitration clause covering disputes arising out of the contract **or** business between the parties evinces a clear intent to cover more than just those matters set forth in the contract.

Similarly, the First Circuit stated in Kristian v. Comcast Corp., 446 F.3d 25, 33 (1st Cir. 2006), that an arbitration provision encompassing claims or disputes "arising out of this agreement or the services provided" is broad, and "[r]ead most naturally, the phrase 'or the services provided' covers

-27-

claims or disputes that do not arise 'out of this agreement'...." <u>See</u> <u>also</u> <u>Zink</u>

v. <u>Merrill Lynch Pierce Fenner & Smith, Inc.</u>, 13 F.3d 330, 332 (10th Cir.

1993) ("[A]ny controversy between [the parties] arising out of [plaintiff's]

business or this agreement shall be submitted to arbitration" applies to

dealings that occurred prior to the execution of the agreement containing the

arbitration clause).

Similarly, in this case, the arbitration clause provides for

arbitration of claims arising from or relating "to this agreement, our

relationship <u>or</u> your services" (Doc. 200-1, p. 4) (emphasis added). Thus, the

disjunctive shows that the parties intended the arbitration clause to extend

beyond disputes related to the Client Agreement.

Furthermore, the plaintiff's contention that the arbitration clause

is limited to CareOne's services and relationship "<u>under the agreement</u>"

impermissibly adds limiting language to this provision. Thus, "relationship"

and "services" are not qualified by the phrase "under the agreement" (<u>see</u> <u>id</u>.,

p. 4). Therefore, "under the agreement" adds words of limitation and "there

is no justification for rewriting the arbitration provision in this way." <u>Kristian</u>

v. <u>Comcast Corp.</u>, <u>supra</u>, 446 F.3d at 33.

-28-

Correspondingly, the plaintiff's interpretation of the arbitration clause is untenable because it renders part of it superfluous. Thus, the arbitration clause identifies as arbitrable claims "arising from or relating to this agreement" (Doc. 200-1, p. 4). Therefore, to limit the words "our relationship or your services" to those "under the agreement" would render those terms superfluous and meaningless. In other words, if the arbitration clause only covered matters arising from the retainer agreement, there would be no point in adding the terms "our relationship or your services."

It is axiomatic that the interpretation of a contract which gives effect to all provisions of the contract is preferable to one which renders part of the writing superfluous, useless or inexplicable. <u>Golden Door Jewelry Creations, Inc.</u> v. <u>Lloyds Underwriters Non-Marine Ass'n</u>, 117 F.3d 1328, 1338 (11th Cir. 1997), <u>citing</u> <u>Restatement (Second) of Contracts</u> § 203(a) (1981); <u>In re Hedrick</u>, 524 F.3d 1175, 1189 (11th Cir. 2008) (a statutory interpretation that "renders one provision superfluous ... is an interpretative no-no"). Accordingly, in order to give meaning to each term of this arbitration clause, and considering that any doubts concerning the scope of arbitrable issues are resolved in favor of arbitration, the only reasonable

-29-

construction of the arbitration clause is that it broadly encompasses disputes arising out of, or relating to, the plaintiff's relationship with CareOne or the financial services to be provided by CareOne to the plaintiff, regardless of whether they pertain to the Client Agreement.

The plaintiff argues further that her relationship with, and the services from, CareOne under the Retainer Agreement were different from those under the Client Agreement (Doc. 207, p. 4).  However, since the arbitration clause is not limited to relationships and services "under the Client Agreement," whether the services under the Retainer Agreement are different is not significant.

The plaintiff also contends that the arbitration clause is inapplicable because the Retainer Agreement created a "new and different relationship" between her and CareOne (id.).  In this regard, the plaintiff notes that the arbitration clause specifies "relationship" in the singular, and she argues that, if arbitration were intended to apply to a relationship other than the one under the Client Agreement, the arbitration clause would have specified "relationships" in the plural tense. However, it is unnatural to speak of one party's relationship with another party as involving plural

-30-

relationships. In all events, as discussed above, it is unreasonable to construe the arbitration provision as limited to disputes under the Client Agreement.

Finally, the plaintiff argues that CareOne's motion to compel arbitration impermissibly "rests on the premise that an arbitration provision in one contract between the two parties necessarily entitles a party to that contract to compel arbitration even as to claims arising under a new and separate contract involving those parties" (Doc. 207, p. 4; see also Doc. 212). In this regard, the plaintiff cites a comment from Klay v. All Defendants, 389 F.3d 1191, 1201 (11th Cir. 2004), that "having one contract which contains a broad arbitration agreement does not necessarily mean that arbitration can be compelled when the subject of the dispute arises from a separate contract which does not have an arbitration clause."

First, the plaintiff misconstrues CareOne's argument. Thus, CareOne's contention focuses on the broad language of this arbitration clause; CareOne does not argue that, as a general matter, an arbitration provision in one contract binds those parties to arbitrate disputes arising from other agreements.

Furthermore, <u>Klay</u> does not hold that an arbitration provision in one contract may not be applied to a claim arising out of another contract. Rather, <u>Klay</u> merely states that a broad arbitration agreement "does not necessarily mean" it is applicable to other contracts, and reiterates the well-established principle that the applicability of an arbitration clause depends upon what the parties agreed to arbitrate.  <u>Id</u>. at 1201-02.

Notably, a broad arbitration provision, such as the one in this case, is not necessarily limited to disputes arising from the agreement in which it is contained.  In this regard, the Eleventh Circuit has stated:

> There ... is nothing unusual about an arbitration clause ... that requires arbitration of all disputes between the parties to the agreement. We have enforced such a clause before because it "evince[d] a clear intent to cover more than just those matters set forth in the contract."

<u>Bd. of Trustees of City of Delray Beach Police and Firefighters Retirement System</u> v. <u>Citigroup Global Markets, Inc.</u>, 622 F.3d 1335, 1343 (11th Cir. 2010).  <u>See</u> <u>also</u> <u>Brown</u> v. <u>ITT Consumer Financial Corp.</u>, 211 F.3d 1217, 1221 (11th Cir. 2000) (a party cannot avoid arbitration because the clause uses all-encompassing language); <u>Belke</u> v. <u>Merrill Lynch, Pierce, Fenner & Smith,</u>

supra, 693 F.2d at 1028 (an arbitration provision can govern disputes not only

arising from the contract itself that contains the arbitration clause, but also

disputes arising from the business relationship in general); Kristian v.

Comcast Corp., supra, 446 F.3d at 33 (arbitration clause covers disputes

beyond the agreement containing the arbitration provision); Cara's Notions,

Inc. v. Hallmark Cards, Inc., 140 F.3d 566, 569 (4th Cir. 1998) (arbitration

clause in one contract applies to a dispute arising out of another contract

between the parties based on the broad language of the arbitration clause that

provided arbitration applied to any claim "arising out of or relating to ... any

aspect of the relationship" between the parties).

In sum, for the foregoing reasons, the arbitration provision

contained in the Client Agreement is applicable to the plaintiff's claims

alleged in the amended complaint. Therefore, CareOne's motion to compel

arbitration of those claims (Doc. 200) is granted.

III.

The law firm defendants move to dismiss the claims against them

pursuant to Rules 12(b)(2), (6), Fed.R.Civ.P. Specifically, the law firm

defendants argue that: (1) this court lacks personal jurisdiction over Ruther

-33-

and Persels; (2) the law firms are not "credit repair organizations" under the

CROA; and (3) the plaintiff has failed to state a claim for relief with respect

to the claims for legal malpractice, negligence, breach of fiduciary duty, and

negligent supervision (Doc. 202).

A. As indicated, the law firm defendants first contend that the

counts against Ruther and Persels should be dismissed for lack of personal

jurisdiction (id., pp. 2-8).

In order to establish personal jurisdiction over a non-resident

defendant, a plaintiff must show, first, that jurisdiction is authorized by

statute, and, second, that the exercise of jurisdiction is consistent with due

process. International Shoe Co. v. Washington, 326 U.S. 310 (1945); Sun

Bank, N.A. v. E.F. Hutton & Co., Inc., 926 F.2d 1030, 1033 (11th Cir. 1991).

Where no evidentiary hearing is held, the plaintiff must first

demonstrate a prima facie case of personal jurisdiction.[6] Madara v. Hall, 916

F.2d 1510, 1514 (11th Cir. 1990). "The district court must accept the facts

alleged in the complaint as true, to the extent they are uncontroverted by the

---

[6]During oral argument, the parties indicated that an evidentiary hearing would not
be required in this case.

defendant's affidavits." Id. To the extent that the plaintiff's complaint conflicts with the defendant's affidavits, all reasonable inferences must be construed in favor of the plaintiff. Id.

To satisfy the first prong of this analysis, the plaintiff relies upon the provision of Florida's long-arm statute that states, in pertinent part (§48.193(1), Fla. Stat.):

> (a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> 2. Committing a tortious act within this state.
>
> ...
>
> 6. Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury ...

-35-

a. The defendant was engaged in solicitation or service activities within this state ...

...

7. Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

"Florida's long-arm statute is to be strictly construed." Sculptchair, Inc. v.

Century Arts, Ltd., 94 F.3d 623, 627 (11th Cir. 1996).

The law firm defendants assert that Ruther and Persels, who both reside in Maryland, are not subject to specific personal jurisdiction in Florida.[7] In declarations, Ruther and Persels aver, among other things, that they do not: (1) have offices or bank accounts in Florida, (2) maintain personal business licenses in this state, (3) own property here, or (4) personally supply goods or services in Florida (Docs. 203, 204). Persels states that he does not transact any personal business in Florida (Doc. 204, ¶4); Ruther alleges that he does not conduct personal business in Florida, but

---

[7]It is noted that the law firm defendants also argue that Ruther and Persels are not subject to §48.193(2), Fla. Stat., which states "[a] defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." However, the plaintiff's opposition memorandum appears to focus only on the issue of specific jurisdiction (see Doc. 208, pp. 2-7).

he is a licensed pilot and attends a flight simulator school in Orlando, Florida approximately five days a year (Doc. 203, ¶5). Finally, both Ruther and Persels aver that they have not entered into a contract in their personal capacities to perform services for the plaintiff, they do not know her and have never personally spoken or communicated with her, and they have never performed legal services for her (id., ¶11; Doc. 204, ¶10).

Significantly, the law firm defendants in their motion do not meaningfully discuss the various grounds upon which personal jurisdiction may be obtained over Ruther and Persels in this case under Florida's long-arm statute (see Doc. 202, pp. 3-4). Thus, the law firm defendants merely make the conclusory assertion that Ruther and Persels did not engage in substantial activity in Florida, and assert that the "Plaintiff does not allege that Ruther or Persels individually committed tortious conduct in Florida" (id.). There is no mention of other bases of personal jurisdiction.

The thrust of the law firm defendants' argument is that personal jurisdiction over Ruther and Persels is barred by the "corporate shield doctrine" (id., p. 4). "Under the corporate shield doctrine, any activity in one's capacity as a corporate officer or director is exempted from

consideration in support of the exercise of long-arm jurisdiction over said officer or director." <u>Carter</u> v. <u>Estate of Rambo</u>, 925 So.2d 353, 356 (Fla. App. 2006). "The rationale of the doctrine is the notion that it is unfair to force an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer." <u>Doe</u> v. <u>Thompson</u>, 620 So.2d 1004, 1006 (Fla. 1993) (quotation omitted). However, the corporate shield doctrine will not preclude the exercise of jurisdiction over a defendant who commits intentional torts. <u>Louis Vuitton Malletier, S.A.</u> v. <u>Mosseri</u>, 736 F.3d 1339, 1355 (11th Cir. 2013), <u>citing</u> <u>Doe</u> v. <u>Thompson</u>, <u>supra</u>, 620 So.2d at 1006 n.1; <u>Kitroser</u> v. <u>Hurt</u>, 85 So.3d 1084, 1088 n.3 (Fla. 2012) ("Specifically, a corporate officer who commits fraud or other intentional misconduct outside of Florida may be subject to personal jurisdiction"); <u>State of Florida</u> v. <u>Wyndham International, Inc.</u>, 869 So.2d 592, 597-99 (Fla. App. 2004); <u>Leedom Financial Services, LLC</u> v. <u>Bass</u>, 2010 WL 2367106 (M.D. Fla. 2010).

   In this case, the amended complaint alleges that "[d]efendants are engaged in a false, unfair, misleading, deceptive, fraudulent, and

despicable scheme to entice financially-troubled consumers to enter into so-called 'debt settlement programs'" (Doc. 98, ¶33). It also alleges that "Ruther and Persels developed and devised the scheme described in this Complaint" (id., ¶138). The amended complaint alleges further (id., ¶55):

> CareOne and the Law Firms took as their payment 15 percent of the total amount received from the consumer, leaving no more than 35 to 45 percent of the face value of the consumer's debt to fund a debt settlement plan based on 48 to 52 percent of the original face value of the settled debt. The payment of these funds to the Law Firms and CareOne "off the top" left insufficient sums to fund the debt settlement plans. In other words, the debt settlement plans were designed to fail. Exhibit B, at ¶[sic] 12-13.

The amended complaint alleges, in addition, that the plaintiff, who is a citizen of Florida residing in St. Petersburg, was induced in 2007 by the defendants' "false, misleading, unfair and deceptive advertising, promotions [and] statements" to enter into a debt settlement program (id., ¶10). It alleges that between January 2008 and June 2008 the plaintiff made six payments to the law firms and CareOne (id., ¶90). It then alleges (id., ¶91):

> Although Day paid at least $1,274.34 to the CareOne and the Law Firms, no funds were ever

> disbursed to Day's creditors. Every dollar Day
> paid went towards the fees of CareOne and the
> Law Firms. Her debt was not reduced at all, nor
> was Day ever refunded any amounts.

The amended complaint thus seemingly alleges that Ruther and Persels committed a tortious act within the state. §48.193(1)(a)(2), Fla. Stat. Moreover, it plainly alleges an injury to the plaintiff within the state arising out of an act or omission outside the state while the defendants were engaged in solicitation or service activities in the state. §48.193(1)(a)(6)(a), Fla. Stat. Consequently, the plaintiff has adequately pled a basis for personal jurisdiction of Ruther and Persels.

Importantly, the amended complaint alleges that Ruther and Persels committed fraud and other intentional misconduct. As previously explained, those allegations defeat the corporate shield doctrine.

The law firm defendants could have challenged the allegations supporting personal jurisdiction due to fraud and intentional misconduct by filing contravening affidavits. See Doe v. Thompson, supra, 620 So.2d at 1006. However, while both Ruther and Persels have filed declarations in support of their challenge to personal jurisdiction, those declarations do not address the allegations regarding fraud and other intentional misconduct (see

-40-

Docs. 203, 204). Consequently, those allegations stand unrefuted and the plaintiff had no obligation to submit opposing affidavits. Accordingly, it is unnecessary to assess the declarations of Gusmano that the plaintiff did file (Docs. 98-1, 98-2). And, as noted, the parties indicated at the hearing that an evidentiary hearing would not be required in this case.

The second prong of the jurisdictional issue, the constitutional inquiry, is twofold. First, the defendant must have established such "minimum contacts" with the forum state that the defendant "should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Second, the contacts must be considered along with other factors to determine whether the assertion of jurisdiction comports with the principles of "fair play and substantial justice." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985).

Minimum contacts require the following (Sculptchair, Inc. v. Century Arts, Ltd., supra, 94 F.3d at 631):

> First, the contacts must be related to the plaintiff's cause of action or have given rise to it. Second, the contacts must involve some purposeful availment of the privilege of conducting activities within the forum, thereby invoking the benefits and protections of its laws. Finally, the defendant's

> contacts within the forum state must be such that
> [he] should reasonably anticipate being haled into
> court there.

See Posner v. Essex Ins. Co., Ltd., 178 F.3d 1209, 1220 (11th Cir. 1999).

As indicated, Ruther and Persels are alleged to have developed a deceptive scheme that solicited and defrauded the plaintiff in Florida. Those allegations assert that Ruther and Persels purposefully availed themselves of the privilege of conducting activities in Florida, so that they could reasonably anticipate being haled into court here. Further, under the circumstances, the exercise of personal jurisdiction over the defendants would not transgress traditional notions of fair play and substantial justice. See id. at 1221.

It is noted that in a case alleging similar claims in the Eastern District of Washington, Ruther and Persels moved to dismiss on the ground of lack of personal jurisdiction, and that motion was denied. Bronzich v. Persels & Associates, Case No. 10-0364-EFS (Doc. 155, pp. 8-9). That decision, while consistent with the conclusion here, is not especially informative since Ruther and Persels apparently did not raise there the same arguments they are asserting here.

-42-

B. The defendant law firms move to dismiss the CROA claims against them, arguing that they are not "credit repair organizations" as that term is defined under the CROA (Doc. 202, p. 8). The plaintiff contends that this assertion is meritless, arguing that the services offered by the defendant law firms fall within the plain language of the statute (Doc. 208, p. 7).

"Congress passed [the] CROA ... in response to ... evidence that unscrupulous individuals were making their fortunes by leading consumers to believe that they could repair a consumer's bad credit history." Zimmerman v. Puccio, 613 F.3d 60, 70 (1st Cir. 2010). Consequently, the "CROA requires organizations that fall within its ambit to make certain disclosures prior to doing business with members of the public and prohibits them and persons connected with them from engaging in deceptive practices injurious to the public." Id.

The CROA broadly defines a credit repair organization as (15 U.S.C. 1679a(3)):

> (A) ... any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable

consideration, for the express or implied purpose
of—

(i) improving any consumer's credit record, credit
history, or credit rating; or

(ii) providing advice or assistance to any consumer
with regard to any activity or service described in
clause (i) ...

The plaintiff alleges that the defendant law firms are "credit
repair organizations" under the CROA because "[t]he ultimate purpose of
[their] programs was to improve debtors' credit records, credit histories and
credit ratings ..." (Doc. 98, ¶33). Further, the plaintiff, tracking the language
of the statute, pleads that the defendants are credit repair organizations (id.,
¶34) and alleges further that (id., ¶35):

> The basic services of ... the Law Firms involve,
> expressly and/or impliedly ... improving credit
> behavior prospectively, improving a credit record,
> credit history and credit rating with a more
> favorable rating, history or rating in the future by
> promising to reduce debts to a lower level where
> remaining debts can be paid as agreed and the
> debtor can achieve 'financial health' (i.e., a
> favorable credit rating) that was previously absent.
> Further, ... the Law Firms provided advice and
> assistance to consumers with regard to activities
> and services related to improving consumer
> 'financial health,' including consumer credit
> records, credit histories or credit ratings.

-44-

(see also id., ¶65) (The Attorney Retainer Agreement provided "litigation representation and debt settlement services to improve Plaintiff's credit rating through reducing her debts to a level she could timely pay as agreed.").

Importantly, the law firms accept these allegations as true for the purposes of this motion (Doc. 202, p. 8). Further, counsel for the law firms confirmed at the hearing that they do not dispute at this stage of the litigation the veracity of the allegations, or argue that the allegations are too conclusory to state a claim. See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007).

Rather, the law firms argue that, accepting the plaintiff's allegations as true, they are not credit repair organizations because the CROA was designed only to address abuses by companies that advertise themselves as being able to correct or repair inaccurate entries on consumer credit reports, not entities, like themselves, that merely promise to settle debt (Doc. 202, pp. 8-15). In support of this contention, the law firms rely upon the CROA's legislative history, which was discussed in detail in Hillis v. Equifax Consumer Services, Inc., 237 F.R.D. 491 (N.D. Ga. 2006). See also Plattner v. Edge Solutions, Inc., 422 F.Supp.2d 969 (N.D. Ill. 2006). The courts in

Hillis and Plattner, concerned that the plain language of the statutory definition of "credit repair organization" was too broad, reviewed the legislative history of the CROA and concluded that Congress did not intend for the CROA to encompass all credit-related services.

However, as the plaintiff argues, two more recent appellate courts have rejected that narrow construction of the CROA, holding that this distinction regarding credit repair services has no basis in the statutory text (Doc. 208, pp. 7-9).  See Zimmerman v. Puccio, 613 F.3d 60, 71-72 (1st Cir. 2010); Stout v. Freescore, LLC, 743 F.3d 680, 687-88 (9th Cir. 2014).  The reasoning of those Courts of Appeals is persuasive.

Significantly, the CROA's definition of "credit repair organization" does not distinguish between entities whose purpose is improving past credit from those that promise prospective credit improvement.  Thus, the First Circuit explained (Zimmerman v. Puccio, supra, 613 F.3d at 72):

> By its plain terms, CROA applies to organizations that provide, in exchange for consideration, "any service" for the "express or implied purpose" of improving a consumer's credit record, credit history, or credit rating. 15 U.S.C. § 1679a(3)(A). The language of the Act does not bind the concept

of an improved credit record, credit history, or
credit rating to the literal alteration ("repair") of an
historical record, history, or rating.

Therefore, even assuming that the CROA was not drafted with

prospective credit services specifically in mind, the plain language of the

statute does not exclude a particular type of credit service and it is a "mistake

[to] confin[e] the application of terms used in a broad sense to the relatively

narrow class of cases that prompted Congress to address their subject matter."

General Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 592 n.5 (2004).

This is especially apt in this case because the CROA is part of a "sweeping"

consumer protection act that should be "construed liberally in favor of

consumers."  See Zimmerman v. Puccio, supra; Stout v. Freescore, LLC,

supra.

Furthermore, as the First Circuit cogently explains, the contrast

between past and prospective credit services is arguably a distinction without

a difference.  Thus (Zimmerman v. Puccio, supra, 613 F.3d at 72 (quotation

marks and citation omitted)) :

The ostensibly forward-looking orientation of
representations about improving clients' credit does
not mitigate the obvious message to debtors that
those services might modify the effect of their past

credit history on their credit score. Credit records are constantly changing based on the ongoing performance of the consumer. By improving credit behavior prospectively, a consumer aims to improve a pre-existing credit record, credit history, and/or credit rating with a more favorable record, history, or rating in the future. Thus, credit counseling aimed at improving future creditworthy behavior is the quintessential credit repair service.

Additionally, such a distinction undermines the purpose of the statute, which focuses on consumers "who are inexperienced in credit matters." 15 U.S.C. 1679(a)(2). Thus, as the court in Limpert v. Cambridge Credit Counseling Corp., 328 F.Supp.2d 360, 364 (E.D.N.Y. 2004), noted:

there is a fine line, in advertising and soliciting for credit counseling services to an unsophisticated audience of lower-income debtors, between promising future rewards for credit worthiness, and implying that existing bad credit records may be prematurely expunged.

Consequently, I reject, as several courts have done, see, e.g., Zimmerman v. Puccio, supra, 613 F.3d 60; Stout v. Freescore, LLC, supra, 743 F.3d 680; Helms v. Consumerinfo.com, Inc., 436 F.Supp.2d 1220 (N.D. Ala. 2005), the defendant law firms' contention that, as a matter of law, they are not "credit repair organizations" under the CROA because they offer only prospective credit services.

Finally, the law firms argue that the CROA claims should be dismissed against them because they clearly informed the plaintiff that their services did not include, nor were they for the purpose of, improving her credit score (Doc. 202, p. 13). In this regard, the law firms cite to several statements in the retainer agreement such as, their services "DO NOT include helping you improve your credit report" and that the "debt reduction program may have an adverse effect on your credit report and credit score" (id.).

However, as the Zimmerman and Stout courts have held, such disclaimers are insufficient as a matter of law when the plaintiff alleges that the defendants have otherwise expressly or impliedly represented that their services will improve the consumer's credit. See Zimmerman v. Puccio, supra, 613 F.3d at 72 (defendant cannot advertise that it would help improve clients' credit ratings but escape liability under the CROA by inserting a disclaimer in its contract about the relevance of its services to the credit rating of its clients); Stout v. Freescore, LLC, supra, 743 F.3d at 686 n.1 (a self-serving disclaimer that an entity is not a credit repair organization does not cure representations it allegedly made that it offers services that could improve a consumer's credit).

-49-

In sum, the law firm defendants' offering of debt management services does not mean that they cannot be held liable under the CROA. Therefore, it cannot be determined as a matter of law at this stage of the proceedings that the defendant law firms do not qualify as credit repair organizations. Accordingly, the motion to dismiss the CROA claims against the law firm defendants is denied.

C. The law firm defendants argue that the claims against them for legal malpractice, breach of fiduciary duty, negligence, and negligent supervision should be dismissed for failure to state claims for relief (Doc. 202, pp. 15-18).

A complaint may be dismissed upon motion under Rule 12(b)(6), Fed.R.Civ.P., for "failure to state a claim upon which relief can be granted." The United States Supreme Court has retired the standard in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," in favor of a stricter pleading standard. Bell Atlantic Corp. v. Twombly, supra. Thus, although a complaint does not need detailed factual

allegations, "a formulaic recitation of the elements of a cause of action will not do." Id. at 555. Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level," based on the assumption that the allegations are true (even if doubtful in fact). Id. The Supreme Court has subsequently applied the Twombly plausibility standard in Ashcroft v. Iqbal, 556 U.S. 662 (2009).

The Eleventh Circuit has made clear that it remains the law that on a Rule 12(b)(6) motion to dismiss the pleadings are construed broadly, and the allegations in the complaint are viewed in the light most favorable to the plaintiff. Watts v. Florida International University, 495 F.3d 1289, 1295 (11th Cir. 2007).

In Counts VIII, IX, and XIII of the amended complaint, the plaintiff asserts that the law firm defendants are liable for legal malpractice, breach of fiduciary duty, and negligence. In essence, the plaintiff alleges that, as a result of the defendants' negligence or breach of fiduciary duty, she was sued by two creditors and, ultimately, those lawsuits ended with default judgments against her.

Under Florida law, a plaintiff bringing a breach of fiduciary duty claim must establish "the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." Gracey v. Eaker, 837 So.2d 348, 353 (Fla. 2002).  Similarly, a plaintiff alleging legal malpractice must show: (1) the attorney's employment; (2) the attorney's neglect of a reasonable duty; and (3) the attorney's negligence was the proximate cause of a loss suffered by the plaintiff.  Jackson v. BellSouth Telecommunications, 372 F.3d 1250, 1281 (11th Cir. 2004); Larson & Larson, P.A. v. TSE Industries, Inc., 22 So.3d 36, 39 (Fla. 2009).

There appears to be no dispute regarding allegations of the existence of a duty and the breach or neglect of that duty.  Instead, the argument focuses on the issue of proximate cause.

The law firm defendants argue that the plaintiff has not stated "viable claims for legal malpractice or breach of fiduciary duty because Plaintiff fails to allege that her creditors would not have recovered those judgments if Defendants had served as her attorney" (Doc. 202, p. 16).  In this regard, the law firm defendants contend that the plaintiff "fails to allege that she did not owe the money to her creditors or that she had valid defenses to

their claims" (id., p. 17), and the plaintiff has failed to carry her burden of proving that she sustained a certain amount of damages.

At the hearing, plaintiff's counsel persuasively argued that an attorney would be liable for legal malpractice if she were to represent to a potential client that she could or would attempt to settle a lawsuit on a particular set of terms and then failed to attempt to settle the lawsuit, resulting in judgments which were likely greater than what would have been the case if the lawsuits had been defended.

Moreover, the plaintiff has set forth a nonspeculative basis on which to assess damages in this case. Thus, the amended complaint alleges that "CareOne tracks statistics regarding debt settlement plans and regularly settled a consumer's unsecured debts in the range of 48 to 52 percent of original face value of a consumer's unsecured debt, based on a plan that would take 60 months to complete" (Doc. 98, ¶53).

As indicated, the law firm defendants also seek dismissal of the plaintiff's claims for negligent supervision (Doc. 202, pp. 17-18). In Count XI, the plaintiff contends that all of the law firm defendants are liable for negligent supervision of the CareOne employees. Further, in Count XII, the

plaintiff raises a claim for negligent supervision of field attorneys by Persels & Associates, Ruther & Associates, Persels, and Ruther.

To prove a cause of action for negligent supervision under Florida law, the plaintiff must show "(1) the existence of a relationship giving rise to a legal duty to supervise; (2) negligent breach of that duty; and (3) proximate causation of injury by virtue of the breach." Albra v. City of Fort Lauderdale, 232 Fed. Appx. 885, 888 (11th Cir. 2007). "[T]he underlying wrong allegedly committed by an employee in a negligent supervision or negligent retention claim must be based on an injury resulting from a tort which is recognized under common law." Johnson v. Galencare, Inc., 2014 WL 6674622 at *3 (M.D. Fla. 2014), quoting Scelta v. Delicatessen Support Services, Inc., 57 F.Supp.2d 1327, 1348 (M.D. Fla. 1999).

The law firm defendants contend that the claim for negligent supervision of the CareOne employees fails because the plaintiff "has not alleged that a contractual or fiduciary relationship existed between her and CareOne employees which created some legal duty owed to her" (Doc. 202, p. 18). The plaintiff, on the other hand, asserts that the law firm defendants owed a duty of care to the plaintiff by virtue of the Retainer Agreement, since

-54-

that agreement provides that the debt resolution services were to be performed by Ruther & Associates "and its administrative staff at CareOne Services, Inc." (Doc. 208, p. 12; see Doc. 98-3, p. 1). The plaintiff's argument is persuasive.

Finally, the law firm defendants argue that the negligent supervision counts fail adequately to allege proximate causation (Doc. 202, p. 18). For the reasons discussed in connection with the claims for legal malpractice and breach of fiduciary duty, this contention also fails.

It is, therefore, upon consideration,

ORDERED:

1. That Defendant CareOne Services, Inc.'s Motion to Dismiss for Lack of Subject Matter Jurisdiction and to Compel Arbitration or, in the Alternative, to Dismiss Plaintiff's Amended Complaint (Doc. 200) be, and the same is hereby, **GRANTED** to the extent that the plaintiff is compelled to arbitrate her claims against CareOne.

2. That the Motion of Defendants, Persels & Associates, LLC, Ruther & Associates, LLC, Jimmy B. Persels, Neil J. Ruther, and Robyn R.

Freedman, to Dismiss Amended Class Action Complaint (Doc. 202) be, and the same is hereby, **DENIED**.

       3. That Defendant Freedom Point n/k/a CareOne Services, Inc.'s Motion to Alter or Amend and/or Seek Relief from Judgment Dated May 9, 2011 (Doc. 210) be, and the same is hereby, **DENIED** as moot.

       DONE and ORDERED at Tampa, Florida, this 30ᵗʰ day of January, 2015.

 

                             THOMAS G. WILSON
                       UNITED STATES MAGISTRATE JUDGE